# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

———————————————————— )
)
ADELMAN'S TRUCK PARTS )
CORPORATION, )
)   **Case No.** 5:17-cv-2598(JRA)
Plaintiff, )
)
v. )
)
JONES TRANSPORT and DON JONES, )
)
Defendants. )
———————————————————— )

## DECLARATION OF DEFENDANT DON JONES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, IN SUPPORT OF DEFENDANT'S REQUEST TO DEFER CONSIDERATION OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant DON JONES hereby declares under penalties of perjury that the following statements are true to the best of his knowledge, information, and belief:

1.   I am the Defendant in this action and I am therefore fully knowledgeable regarding the facts and circumstances of the case.

2.   I am making this Declaration in opposition to the summary judgment motion filed by Plaintiff Adelman's Truck Parts Corporation ("Adelman").

3.   Specifically, I am making this Declaration to show that Adelman and I disagree over basic facts that have a bearing on the outcome of this case.

1

## My Background

4.      I have been a small businessman in the transportation industry for about thirteen years.

5.      For the last seven years, I have operated Jones Transport as a sole proprietor. During that time, I have made hundreds of trips from High Point, N.C. to Kansas City, Mo.

6.      For about six years before that, I was the co-owner of a business that owned a truck and operated as an independent contractor for FedEx.

7.      I have been heavily involved in motor racing in various capacities since about 1970.

8.      I worked for the Richard Childress Racing team in the 1980s, during a period in which that team won six Winston Cup championships with Dale Earnhardt as a driver.

9.      Because of these experiences, I am familiar with the way that motors work as well as the commercial standards in the trucking industry.

## My Decision to Purchase a WAX Motor

10.      Around the beginning of October 2017, the old Caterpillar C7 motor in my truck stopped working properly, and I began looking for a replacement.

11.      CAT manufactured and sold C7 motors for several years, starting around 2003. However, not every C7 motor was identical. While the basic design was the same for all C7 motors, some motors were designed to achieve a higher horsepower than others.

2

12.     In order to easily distinguish one kind of C7 motor from another, CAT assigned different serial number prefixes to different kinds of C7 motors.

13.     Based on my research, there are major differences between the CAT C7 motors manufactured in 2004, with serial numbers beginning with "KAL," that were designed to achieve 190 horsepower, and the CAT C7 motors manufactured in 2007, with serial numbers beginning with "WAX," that were designed to achieve 250 horsepower.

14.     Because circa 2004, 190 hp KAL motors are designed for a slightly different purpose than circa 2007, 250 hp WAX motors, there are several physical differences between the two. For instance, the pistons in a circa 2007, 250 hp WAX motor are longer than the pistons in a circa 2004, 190 hp KAL motor. Also, the gear train in the front of a circa 2007, 250 hp WAX motor has a coarser design than the gear train in the front of a circa 2004, 190 hp KAL motor. As another example, the oil pump in a circa 2007, 250 hp WAX motor pumps a higher volume of oil than the oil pump in a circa 2004, 190 hp KAL motor.

15.     KAL motors and WAX motors also require slightly different accessories, or "componentry," in order to work properly with a vehicle. These include things like computers (Caterpillar calls them Electronic Control Modules or "ECMs"), gaskets, and the like.

16.     I decided to purchase a WAX motor for two reasons. First, and most importantly, I needed the level of horsepower a WAX motor provides in order to safely haul my usual load over the Blue Ridge Mountains out of North Carolina.

3

17.    Second, because my truck already had the correct componentry for a WAX motor, installing the WAX would have been less expensive than installing a KAL motor.

### Adelman Agrees to Sell Me a WAX Motor

18.    I now come to the part of the story where there Adelman and I fundamentally disagree over facts that bear on the outcome of this case.

19.    On the recommendation of someone else in the industry, I called Adelman to ask if they had any WAX motors in stock and, if so, to ask how much they would be.

20.    To be more specific, on October 11, 2017, I asked an Adelman employee named Billy Betz if Adelman could sell me a WAX motor.

21.    Adelman denies that I specifically asked for a WAX motor.

22.    Mr. Betz explicitly promised to sell me a WAX motor for $5,000, plus the costs of shipping.

23.    Adelman denies that Mr. Betz promised me a WAX motor.

24.    Both sides agree that Adelman faxed me a Purchase Order to sign, and that the Purchase Order described the item I was buying as a "Caterpillar C-7 Motor." A true and correct copy of the Purchase Order I signed is attached as **Exhibit A**.

25.    I did not think twice about signing a Sales Order describing the item as a "Used Caterpillar C-7 Motor," because a WAX Motor *is* a kind of Caterpillar C-7 Motor.

4

26.     Both sides agree that, when a Motor arrived for me at Bryans Truck Repair Inc in High Point, North Carolina, it came with a Packing Slip that described the Motor as a "Used Caterpillar C-7 Motor, Serial # KAL61215." This was the first time I learned that Adelman had shipped me a KAL Motor, instead of the WAS Motor Mr. Betz had agreed to sell me.

27.     It would have been easy for Adelman to include the serial number on the Sales Order, just as it did on the Packing Slip, so I could verify the kind of motor Adelman would be shipping me.

28.     The fact that Adelman didn't include the serial number on the Sales Order leads me to believe that Adelman fully intended to ship me a different kind of CAT C7 motor than the kind I ordered – and they intentionally left the serial number off of the Sales Order so that I wouldn't realize I was the victim of a bait-and-switch until after I had signed their boilerplate terms-and-conditions and wired them over $5,000.

29.     In other words, Adelman either lied to me about having a WAX motor to sell me, or, after I agreed to purchase a motor, Adelman discovered that it didn't have a WAX motor, and intentionally concealed the fact that it was sending me a different kind of motor by leaving the serial number off of the Sales Order. Either way, Adelman acted in bad faith.

### Adelman Employs Unfair and Deceptive Practices to Pressure Me to Accept the Nonconforming Motor

30.     Earlier this year, my attorney filed an audio CD containing seven recorded telephone conversations between myself and Adelman. I listened to the CD

before my attorney mailed the CD to the courthouse, and the tracks on it are true and accurate recordings of telephone conversations I had with Adelman, after I learned that they had pulled a bait-and-switch on me.

31.    The conversation that appears at Track Two of the CD is important, because it was during this telephone call that Mr. Betz employed unfair and deceptive practices to pressure me into accepting the nonconforming motor.

32.    First of all, as the Court can hear for itself from the CD, Mr. Betz repeatedly tried to convince me that a KAL motor is the same thing as a WAX motor. As I've already explained, this is simply not true.

33.    Second of all, Mr. Betz attempted to use the Sales Order as a bludgeon to force me to keep the nonconforming KAL motor. In doing so, he repeatedly lied about my legal rights and Adelman's legal duties under the Sales Order.

34.    For one thing, Mr. Betz said that I could only return the nonconforming KAL motor if I paid to ship the motor back and if I agreed to a 20% "restocking fee." Mr. Betz kept insisting that my only option, apart from that, was to keep the KAL motor.

35.    The Sales Order *does* include an "Exclusive Remedies" clause. But my Exclusive Remedies were quite different than what Mr. Betz described . . . or, frankly, than what Adelman's attorneys have repeatedly described to this Court. In fact, the Exclusive Remedies clause reads:

> Seller shall not be liable to buyer . . . for any direct,
> indirect, special, incidental or consequential damages,
> whether based on contract, tort, or any other legal theory.
> Buyer's exclusive remedy relating to the goods shall be

6

> limited solely to *either* seller's return of *the purchase amount* upon seller's return of the non-conforming goods *or seller's repair, correction and/or replacement of any of the goods which are defective and/or nonconforming*.

(Emphasis added).

36.     In other words, the Exclusive Remedies clause gave me a choice between refund of the *full* purchase price, or replacement of the nonconforming goods.

37.     The Exclusive Remedies clause says that, if I chose a refund, I was entitled to the full purchase price. This is inconsistent with the note at the top of the Sales Order, which says, "20% Handling Charge on All Returns."

38.     I submit that the Exclusive Remedies clause at the bottom of the Sales Order controls – if for no other reason than that it's unconscionable to ask a customer to pay a 20% restocking fee when the *seller* has shipped the wrong goods to the customer.

39.     If the Court listens to the Track Two of the Audio CD, it will hear that I asked about the possibility of replacing the KAL motor with a WAX motor. The Court will also hear Mr. Betz telling me that Adelman did not have a WAX motor in stock.

40.     At that moment, the Exclusive Remedies clause failed of its essential purpose, meaning that the Exclusive Remedies clause no longer bound me.

41.     Nevertheless, Mr. Betz continued to mislead me concerning my legal rights under the Sales Order.

42.     As I told Mr. Betz during the telephone call found on Track Two of the Audio CD, I was between "a rock and a hard place." After shipping the nonconforming motor back to Adelman at my own expense, and forfeiting $1,000 in the form of a 20% restocking fee, I would not have had enough money leftover to buy the right kind of motor from a different used motor dealer.

43.     Mr. Betz knew this, yet continued to misrepresent my legal rights under the Sales Order, saying that my only two options were to forfeit the $1,000 or keep a KAL motor that I had never wanted.

44.     Mr. Betz also repeatedly told me that Adelman had tested the Motor and that it had run well.

45.     Under duress, I indicated to Mr. Betz that I would keep the KAL motor, and I instructed my mechanic to install it.

### Mechanic Lee Bryan Installs the Motor and Finds a Large Piece of the No. 4 Piston Lying in the Oil Pan.

46.     My mechanic, Lee Bryan, then proceeded to install the KAL Motor into my truck.

47.     In addition to his fee, which was more than $2,600, I also spent about $265 on componentry such as gaskets that were needed to install a KAL Motor into my truck. I would not have needed to buy that componentry if I had actually received a WAX Motor, as Adelman had agreed.

48.     After the KAL Motor was installed, but before I or my mechanic actually ran the motor, Mr. Bryan removed the oil pan from the Motor. The reason

he did this was that I already had a different, larger oil pan that worked well with my truck, which I wanted to use instead.

49.    When Mr. Bryan removed the oil pan, he found a large broken-off piece of the No. 4 piston, measuring several inches across, lying inside.

50.    As someone who has worked with motor vehicles in some form or another for most of my life, I would never attempt to drive a vehicle after a piece of a piston that large had broken off.

51.    Again, based on my many years of working in the trucking industry and with motor vehicles generally, I can say with certainty that no reasonable member of my trade would have set off with a large load on a cross-country trip, knowing that that large of a piece had broken off one of the pistons.

52.    As I said to Carl Adelman during a phone call on October 24, 2017 (a true and correct recording of which appears as Track Five of the Audio CD):

> As nice as I can say it, I don't believe anybody would
> expect you to run a motor that's got a piece of the piston
> broke off as big as the palm of my hand. I don't think
> anybody would recommend running that motor. Any. I
> mean, I can run it, but if I run it, and another piece of it
> breaks off, and it gets in the crank, and it throws the rods
> out of the side of the motor, and the crank out the bottom
> of the oil pan, you ain't got nothing then.

53.    Moreover – as I pointed out a couple of minutes later to Mr. Adelman – anyone who knows about how engines work would know a piston in that condition would have badly scraped the cylinder wall while the motor was running. The cylinder wall is part of the block, which, under the Sales Order, was warrantied for thirty days.

9

54.     Indeed, a visual inspection of the cylinder wall showed that it *had* been badly scored. I am attaching a true and correct copy of a photograph I took of the cylinder wall after we discovered this problem as **Exhibit C**.

55.     Adelman continued to insist that they had tested the motor and that it had "sounded great."

56.     The scoring on the cylinder walls is important, because when the cylinder wall is badly scored, it is difficult or impossible for the engine to maintain the oil pressure and hold in the compression necessary to make the engine go.

57.     Once a cylinder wall – which is part of the engine's block – becomes scored, it is only a matter of time before the engine fails, because as the broken piston continues to scrape against the cylinder wall 2,300 times a minute, the scoring can only get worse.

58.     Based on my experience in the trucking industry and my knowledge of motors, I do not believe that any reasonable person in my line of business would relied on the Motor Adelman shipped me even for a short trip, let alone a cross-country haul.

59.     I encourage the Court to listen to Tracks Three through Six of the previously filed Audio CD. Taken together, those telephone calls clearly show that I revoked acceptance of the Motor after I discovered the hard-to-find problems with the piston and the cylinder wall.

60.    In any case, when I revoked my acceptance, I was still well within the thirty-day warranty for the engine block. Again, the cylinder wall is part of the engine block.

61.    Mr. Adelman did eventually agree to refund the full purchase price of the Motor. However, by that point – because of Adelman's bad faith in sending me the wrong kind of motor, because of Adelman's false representations that the motor had run well and "sounded great", and because of Adelman's unfair and deceptive representations concerning my legal rights, I had already spent about $2,900 to install a motor that was not only the wrong kind of motor but which was also in pieces by the time it arrived in North Carolina.

62.    Also, because of the delays caused by Adelman's bad behavior, I was not getting back on the road as quickly as I should have, so I was losing income.

63.    The bottom line is that Adelman did not offer me the full refund to which I was entitled when I first complained about receiving the wrong type of motor. By the time Adelman *did* agree to a full refund, it was no longer sufficient, because I had already spent thousands of additional dollars as a result of their bad behavior. In other words, I could not accept the full refund at that time for the same reason that I could not accept the partial refund earlier: Because I would not have been left with enough money to buy another used motor from a different dealer.

## Conclusion

64.    As the Court can see, the text of the Sales Order, which I admit that I signed, is not the only fact that has a bearing on the outcome of this case. No matter

what the Sales Order says, Adelman was still obligated to act in good faith and tell me the truth. Adelman failed to live up to that obligation. Also, regardless of what the Sales Order says, Adelman did not have a right, knowing that I was under financial duress, to pressure me into accepting a Motor by misrepresenting my legal rights. Finally, regardless of what the Sales Order says, Adelman does not have the right to renege on the explicit 30-day warranty covering the block and crank, given that a broken piston has badly damaged the block.

65. For these reasons, I respectfully ask the Court to deny Adelman's Motion for Summary Judgment.

Dated:  Thomasville, N.C.
July 18, 2018

Defendant Don Jones

12